IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBRA KINGSBURY

      Plaintiff,

                                  1:14-CV-24-PK

                                  FINDINGS AND
                                  RECOMMENDATION

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff Debra Kingsbury filed this action January 6, 2014, seeking judicial review of the

Commissioner of Social Security's final decision denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"). This court has jurisdiction

over Kingsbury's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

      Kingsbury argues that, in part by erroneously rejecting and/or failing to consider medical

evidence, the Commissioner erred at the third step of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits in failing to find that Kingsbury's impairments met or equaled one or more of the listed impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1. Kingsbury may additionally intend to argue that the Commissioner failed properly to assess her residual functional capacity after completing the third step of the five-step sequential process, and for that reason failed to carry her burden at the fifth step of the process. I have considered the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise,

the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual['s] ability to work." *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets her burden to demonstrate the existence in

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id., citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is

immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d

1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Kingsbury was born August 31, 1963. Tr. 32, 85, 95, 96, 164, 166, 172, 181, 193, 205,

299.[3] She received a high school diploma, but has not apparently received any subsequent formal

education or vocational training. Tr. 32. According to the evidence of record, prior to her

claimed disability onset date of February 1, 2008, Kingsbury worked as a laundry worker, a

housekeeper, a garment worker, and a deliverer. Tr. 32, 73-75, 174-180. The record indicates

that Kingsbury worked for a period of approximately two months following her claimed

disability onset date, but that her earnings from such employment were not sufficient to

constitute substantial gainful employment for purposes of the Act. Tr. 185.

The earliest medical report appearing in the administrative record is a comprehensive

psychological evaluation prepared by Eric M. Morrell, Ph.D., on the basis of interviews and tests

he conducted on January 31 and February 3, 2006, in connection with an inquiry by the Oregon

Department of Human Services as to whether Kingsbury's children could safely be returned to

her following a three month period of intense drug abuse during which her younger children had

been removed from her custody. Tr. 225-236. Morrell opined that Kingsbury's "self-report was

riddled with inconsistencies" and characterized numerous of her self-reported claims regarding

---

[2] The following recitation constitutes a summary of the evidence contained within the
Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 12.

her life experience as "nothing short of fantastic." Tr. 230. Morrell opined that Kingsbury was a

"highly unreliable individual who misrepresented a host of legal events, always criticizing the

system, accusing it of having been in error, exonerating herself, and casting blame on other

individuals." Tr. 234. "[I]n each case," Morrell opined, "[Kingsbury] was [self-reportedly]

falsely accused yet always convicted." Tr. 234. Regarding her unreliable self-reporting, Morrell

stated:

> Were it not for [Kingsbury]'s presentation as an individual who could "kid
> herself" with fantastic tales, true features of psychosis would have clearly been
> concluded. (Drug use also may have been operating at such points). Thus,
> [Kingsbury] presented an unreliable self-report, with disjointed and possibly
> psychotic thinking processes. Were it not also for her generally intact
> associations, psychosis would have been the "default." Nonetheless, a true
> psychosis was not ruled out.

Tr. 230. Specifically regarding psychosis, Morrell similarly opined that:

> Certain of [Kingsbury's] descriptions suggested the possibility of psychosis,
> although her associations were typically intact, and she simply did not present as
> an individual actively delusional. [Morrell was] more inclined to see [Kingsbury]
> as someone who is low-functioning in the verbal arena and more inclined toward
> characterologically pathologic lying in which she creates fantasies that are simply
> 'ridiculous' and has done so for an extended period of time. [Kingsbury's]
> misrepresentation collectively distills down to character-disordered features in an
> individual who seems to be a creature of habit, prone toward misrepresentation
> and shady dealings without accountability. When "caught," she cries innocence
> and claims the system misunderstood her or she was the victim of circumstances.

Tr. 235.

Morrell ruled out generalized anxiety disorder, obsessive-compulsive disorder, panic

disorder, and social phobia as diagnoses for Kingsbury. Tr. 227. Morrell opined that it was

possible, but unlikely, that Kingsbury suffered from post-traumatic stress disorder ("PTSD"). Tr.

227. Morrell found that Kingsbury's attentional properties "were generally intact," Tr. 230-231,

and that she manifested a borderline verbal intellect and a marginally average performance/

Page 7 - FINDINGS AND RECOMMENDATION

nonverbal intellect on the WAIS-III intelligence test, Tr. 231. Morrell found no "evidence of attentional disturbance on the Conners Performance Test." Tr. 232. Morrell opined that Kingsbury's MMPI-2 personality inventory and other psychometric tests were of "compromised psychometric reliability and validity based on significant defensiveness," Tr. 232, but that such tests nevertheless indicated an absence of depression or anxiety, and generally produced results consistent with "character disordered features, self-indulgence, hyperactivity and impulsivity, risk-taking behavior, failure to learn from consequences, and a history of antiauthoritarian involvement and illegal activity," Tr. 232. Individuals meeting that profile, Morrell opined:

> tend to be overactive, impulsive, irresponsible, untrustworthy, and shallow in their interpersonal relationships. They characteristically have easy morals, fluctuating ethical values, and readily circumvented consciences. A high percentage of these individuals engage in extramarital relationships and have very poor marital adjustment. They are typically quite egocentric and, while forming a favorable impression, are often derelict in their responsibilities toward others. . . . Their poor self-control often contributes to drinking and/or drug difficulties. . . . Such individuals tend to have an especially well socialized veneer and are often glib. Prognosis for change is very poor, with many terminating treatment against professional advice.

Tr. 232-233. Kingsbury's "[s]ubscale analysis was most striking for the absence of depression or anxiety. Little indication of distress is noted." Tr. 232.

Morrell diagnosed Kingsbury on Axis I (clinical disorders) with methamphetamine, cocaine, and opioid dependence in sustained remission per self-report, with methamphetamine-induced psychosis, largely resolved, with a history of anxiety disorder NOS, largely resolved, and with a history of probable neglect of children, and made "rule out" diagnoses indicating a mild suspicion of psychotic disorder NOS and possible reading disorder, possible disorder of written expression, possible victim of domestic abuse, and possible perpetrator of domestic abuse. Tr. 233-234. On Axis II (personality disorders and mental

Page 8 - FINDINGS AND RECOMMENDATION

retardation), Morrell diagnosed Kingsbury with borderline verbal intellect, marginally average

performance/nonverbal intellect, and personality disorder NOS with features of histrionic/

narcissistic/antisocial personality, and made a "rule out" diagnosis of antisocial personality

disorder. Tr. 234. Morrell deferred diagnosis on Axis III (general medical conditions), noted

"unclear psychological stressors on Axis IV (psychosocial and environmental problems), and on

Axis V (level of functioning) assigned Kingsbury a global assessment of functioning ("GAF")

score of 50. Tr. 234. Morrell ultimately urged "caution" in connection with DHS' inquiry and

did not recommend that Kingsbury be reunited with her children "just yet." Tr. 235.

On August 22, 2007, Kingsbury consulted with Nancy J. Keeley, N.P., complaining of an

insect bite on her right leg. Tr. 247-248. Keeley's examination revealed a deep laceration from a

knife cut on Kingsbury's thumb. Tr. 247-248. Keeley reported that Kingsbury was able to flex

the thumb against resistance, that she denied weakness in the thumb, and that the cut was healing

without infection. Tr. 247-248.

On May 27, 2010, Kingsbury protectively filed for disability insurance benefits alleging a

disability onset date of February 1, 2008. Tr. 19, 42, 85, 86, 88, 95, 96, 97, 172-173, 181-183.

Kingsbury asserted that the conditions limiting her ability to work were "[c]onsistent migraines -

numb arms - memory loss - back pain, fainting, elbow pain, uncontrollable trembling." Tr. 185.

On August 18, 2010, Oregon Disability Determination Services physician Gregory

Grunwald, D.O., prepared a comprehensive neurologic evaluation of Kingsbury on the basis of

tests, interviews, and review of medical records (not including Morrell's comprehensive

psychological evaluation of 2006). Tr. 299-307. Kingsbury reported to Grunwald that she first

developed migraine headaches approximately twenty years previously, and that she experienced

migraines approximately once per week with symptoms of nausea and dizziness. Tr. 299-300.

Kingsbury further reported to Grunwald that she had fainted twice on hot days over the past two

years and had been diagnosed with heat stroke, but that she had no disabilities associated with

that condition. Tr. 300. Kingsbury further reported that she had experienced elbow pain for

approximately one year but that it was now resolved. Tr. 300. Kingsbury reported a hand tremor

and that she had undergone surgery five days previously in connection with a torn tendon. Tr.

300. Kingsbury further reported that she had never noticed that she had suffered any lapse of

memory, but that her children and her drycleaner had advised her that she had suffered memory

loss; notwithstanding her report to Grunwald, she also recited to Grunwald numerous anecdotes

involving her own memory loss, confusion, or both. Tr. 300. Kingsbury further reported that she

had been experiencing lower back pain for the past two weeks. Tr. 302.

Regarding Kingsbury's migraines, Grunwald opined that her headaches were being sub-

optimally treated without appropriate evidence-based therapy. Tr. 304. Grunwald noted,

however, that Kingsbury reported that coffee helped "resolve" her headaches, as did medical

marijuana which she relied upon at a rate of three ounces per month. Tr. 299, 300. Grunwald

opined that Kingsbury's fainting episodes were likely associated with heat stroke and were

treatable and non-disabling. Tr. 304.

Regarding Kingsbury's elbow, hand, and joint pain, Grunwald found no disabling injury

in Kingsbury's elbows. Tr. 304. Regarding Kingsbury's reflexes in her extremities, Grunwald

found no clonus and no Babinski reflex, and evaluated her reflexes as +2/4 for her bilateral

biceps and triceps, +2/4 for her right patellar and +1/4 for her left patellar, and +1/4 for her

bilateral Achilles tendon. Tr. 302. Grunwald found that Kingsbury's motor strength in her upper

Page 10 - FINDINGS AND RECOMMENDATION

and lower extremities was normal other than in her right forearm, and opined that the weakness of her right forearm was due to her recent surgery and "would likely be 5/5 in a normal situation." Tr. 302-303. Similarly, Grunwald found that Kingsbury's grip strength was reduced in her right hand, Tr. 303, but that her hand strength could be expected to return to normal following recovery from surgery, Tr. 302-303, and that no trembling was observable in Kingsbury's hands, Tr. 304.

Regarding memory loss, Grunwald found that Kingsbury scored a 35/35 on the mini mental state examination. Tr. 301. Grunwald found no evidence that Kingsbury suffered any impairment of memory. Tr. 304.

Regarding low back pain, Grunwald found tenderness to palpation in the paraspinal muscles at the T5 level, and Kingsbury reported that she experienced pain in all of her joints and muscles on both lower extremities, anteriorly, posteriorly, and laterally. Tr. 303. Grunwald asserted that Kingsbury's low back pain was "beyond the scope" of his examination, but nevertheless opined that the symptoms were "possibly associated with degenerative changes and muscle strain." Tr. 304.

Overall, Grunwald found no problems with Kingsbury's gait, stance, or manipulative ability other than that caused by recent surgery, no muscle weakness, no problems with sensitivity, no postural problems, no problems with balance or coordinated movement, and no fatigue problems. Tr. 304-307. Grunwald also found no mental or cognitive deficits or limitations. Tr. 304-307. Grunwald opined that Kingsbury could stand for 30 minutes at a time with periodic breaks, could walk at least half a mile, and could sit for fifteen minutes at a time with periodic breaks. Tr. 306.

The Agency requested that Kingsbury furnish additional medical records in support of her DIB claim, but Kingsbury did not do so in connection with her initial application. Tr. 94.

On September 7, 2010, the Agency determined that Kingsbury was not disabled for purposes of the Act. Tr. 85, 86-93, 116-119. Specifically, the Agency found that Kingsbury had no exertional, postural, manipulative, visual, or communicative limitations and was environmentally limited only to avoiding moderate or greater exposure to hazards. Tr. 90-91.

On October 19, 2010, while on an extended visit to her mother in California, Kingsbury consulted with Reed Horwitz, M.D., complaining of low back pain. Tr. 313-316. An X-ray study of Kingsbury's cervical spine revealed a 4mm cyst in the proximal right carpal navicular and a small benign-appearing exostisis extending medially off the distal right ulnar mataphysis, as well as mild degenerative change with mild impingement on the left C5-C6 nerve root canal, and was otherwise unremarkable. Tr. 313-316.

On October 29, 2010, Kingsbury consulted with Ksenija Peharda, M.D., reporting that after falling several weeks previously she had experienced lacerations that had been sutured. Tr. 317-318. Peharda recorded that Kingsbury presented as distressed and tearful, and that she reported poor memory and difficulty with concentration. Tr. 317-318. Peharda recommended that Kingsbury undergo psychiatric evaluation. Tr. 318.

On November 2, 2010, Kingsbury was seen by Christopher Lambert, M.D., presenting with bizarre behavior and possible psychotic symptoms. Tr. 327-331, 332-335. Notwithstanding that Kingsbury had been seen ouside an institutional setting by Peharda on October 29, 2010, Kingsbury's mother reported to Lambert that Kingsbury had spent the previous five days in jail and had just been released, but that she was not behaving normally. Tr. 327, 332. Lambert

Page 12 - FINDINGS AND RECOMMENDATION

observed that Kingsbury appeared unwell and was twitching and moaning. Tr. 327, 332.

Lambert evaluated Kingsbury as oriented x3 (person, place and time), but as agitated,

emotionally charged, mumbling, acting childish, climbing on furniture, and appearing to be under

the influence of an intoxicant. Tr. 328. Nursing staff evaluation of the same date differed from

Lambert's evaluation, finding that Kingsbury was oriented x1 (person but not place or time) only,

and reporting labile affect and speaking in word salad prose, that she admitted to hearing voices,

and acted strangely. Tr. 332. Lambert recommended that Kingsbury be transferred to an

appropriate psychiatric facility. Tr. 333.

Kingsbury was held in the Santa Barbara County Psychiatric Health Facility from

November 3 to 8, 2010. Tr. 336-362. At intake, Kingsbury denied hearing voices, but was

assessed as suffering from impaired judgment, labile affect, depressed mood, and disorganized

thoughts, Tr. 336, and was diagnosed with psychosis NOS and substance dependence

(methamphetamine, marijuana, alcohol) and a GAF score of 25. Tr. 337. At intake, Kingsbury

was described as "confused and disorganized and acutely psychotic and cannot take care of her

basic needs." Tr. 337. However, by November 8, 2010, Kingsbury stated she wanted to leave

the facility and showed no psychotic symptoms and was oriented in all parameters. Tr. 337.

Facility staff opined that "her course of symptoms in response to treatment . . . were most

consistent with methamphetamine use prior to admission." Tr. 337. At discharge, Kingsbury

was diagnosed with psychosis NOS and substance dependence (methamphetamine), probable

methamphetamine use prior to admission, and a GAF score of 55. Tr. 337.

On November 11, 2010, Santa Barbara County Marriage and Family Therapist R. Sterling

Collett, M.F.T., assessed Kingsbury's functioning following her discharge from the Psychiatric

Health Facility. Tr. 365-373. Collett found that Kingsbury was rambling but cooperative although she "brings up her perceived needs for opiate medications a number of times" and was a "questionable historian" in that some of her reported history was internally inconsistent. Tr. 365. Collett opined that Kingsbury "appears completely disabled and or occupational role at this time" [*sic*]. Tr. 367. Collett further opined that it was "questionable" whether Kingsbury's amphetamine addiction was in fact in remission, Tr. 372, and that Kingsbury's "impairments are significant and she has difficulty in several areas of day to day living, however these appear to be the result of a substance abuse disorder and not a Mental Disorder," Tr. 373.

On November 12, 2010, Kingsbury requested reconsideration of the Agency's finding of non-disability on the ground that she continued to experience headaches and daily leg pain. Tr. 120. Kingsbury's request for reconsideration did not reference her recent psychiatric hospitalization.

On November 15, 2010, Kingsbury began seeking treatment from the Santa Barbara Public Health Department for her pain symptoms. Tr. 381. On November 18, 2010, Kingsbury was seen by Santa Barbara Health Care Services physician Mark Stilphen, M.D., for "fibromyalgia." Tr. 378-381. Kingsbury returned to Santa Barbara Health Care Services to be seen by Stilphen for chest and arm pain and shortness of breath, but apparently left before consulting with him. Tr. 377.

On November 30, 2010, Santa Barbara County sent Harold Ginsberg, M.D., to evaluate Kingsbury's status following her recent psychiatric hospitalization. Tr. 363-3364. Ginsberg found that Kingsbury was coherent, goal-oriented, and oriented x3. Tr. 363.

On December 3, 2010, in connection with her request for reconsideration, Kingsbury

reported to the Agency that her headaches had become more intense since the date of her initial

DIB application. Tr. 195-201. No medical records suggest that Kingsbury reported the increase

in the severity of her headaches to any health care provider.

Following her return to Oregon from California, on January 5, 2011, Kingsbury sought

treatment from the Klamath County Department of Mental Health for high anxiety, panic attacks,

and hallucinations. Tr. 401-405, 406-407, 408, 409. In connection with her initial visit, Tracy

Wonser, Q.M.H.P., diagnosed Kingsbury with panic disorder with agoraphobia and PTSD on

Axis I, deferred diagnosis on Axis II, diagnosed Kingsbury with osteoarthritis and migraines on

Axis III, and noted housing problems, economic problems, problems with the legal system on

Axis IV. Tr. 403-404. On Axis V, Wonser evaluated Kingsbury with a GAF score of 50. Tr.

404. Wonser recommended as a treatment plan "brief therapy for tools to cope with high anxiety

and panic attacks." Tr. 404. Kingsbury saw Wonser again on January 19 and February 7, 2011,

to follow up on her anxiety symptoms. Tr. 410-411, 412-413.

Kingsbury underwent a second X-ray study of her cervical spine in connection with her

neck pain symptoms. Tr. 393, 396. The study revealed no abnormalities. Tr. 393. 396.

Kingsbury consulted with Wonser in follow up on her anxiety symptoms with a friend

present on April 19, 2011. Tr. 414-415. Kingsbury's friend reported an increase in Kingsbury's

word salad and paranoia symptoms. Tr. 414-415.

On April 27, 2011, the Agency found on reconsideration that Kingsbury was not disabled

for purposes of the Act. Tr. 95, 96-114. Specifically, the Agency found as her physical RFC that

Kingsbury was exertionally limited to occasionally lifting or carrying 20 pounds and frequently

lifting or pulling 10 pounds, that she was limited to standing or walking 6 hours of an 8 hour

workday and to sitting 6 hours of an 8 hour workday, that she was posturally limited to occasionally climbing ramps or stairs, stooping, crouching, or crawling, and that she was environmentally limited to avoiding moderate or greater exposure to hazards. Tr. 107-109. The Agency further found as her mental RFC that Kingsbury had no understanding or memory limitations, was moderately limited in concentration and persistence in carrying out detailed instructions and ability to work in coordination with or in proximity to others without distraction, was moderately socially limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism, to get along with coworkers or peers without distracting them, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness, and was moderately adaptationally limited in her ability to respond appropriately to changes in the work setting and to be aware of normal hazards. Tr. 109-111. The Agency notified Kingsbury of its decision on reconsideration effective April 28, 2011. Tr. 121-123.

Kingsbury consulted with Wonser in follow up on her anxiety symptoms on April 28 and May 2, 2011. Tr. 416-417, 418-419.

On May 5, 2011, presented at the Klamath County Department of Mental Health complaining of depression and anxiety and was held there for evaluation and for "respite" until May 9, 2011. Tr. 437-445.

On May 16, 2011, Kingsbury requested a hearing before an ALJ. Tr. 124.

On October 14, 2011, Kingsbury was seen by Lara Kierlin, M.D., for evaluation on Wonser's referral. Tr. 420-423. Kierlin recorded her observations of Kingsbury as follows:

> The individual is somewhat disheveled today. She makes fair eye contact but she is crying throughout the interview. She has a desperate quality to her. She

Page 16 - FINDINGS AND RECOMMENDATION

appears extremely anxious. Her speech at times is whiney and sad sounding. She has normal rate and rhythm. She has very poor reality testing and she has an almost delusional quality to her anxiety. She is not able to process any reassuring statements. She is very sticky when it comes to the belief which is a fixed false belief I believe and is delusional that she is imminently going to be hospitalized for hallucinations which she does not have. She is paranoid. She has some psychomotor agitation. She has a very labile affect. She can smile appropriately. Her mood is "worried." Thought process is very tangential, very negativistic. Thought content, she denies suicidal or homicidal ideation. She vehemently denies auditory/visual hallucinations however she does have this delusional quality to her anxiety. Insight is impaired. Judgment is impaired. Cognition is intact. Attention and concentration are fair.

Tr. 422. Kierlin diagnosed Kingsbury with "Anxiety Disorder NOS, Panic Disorder with

Agoraphobia, Cannabis Dependence, and R/O Psychotic Disorder due to Cannabis Use" on Axis

I, deferred diagnosis on Axis II, diagnosed Kingsbury with "osteoarthritis, degenerative disc

disease in her cervical spine, migraines, and pain from a wrist injury" on Axis III, and made the

notation "moderate" on Axis IV. Tr. 422-423. Kierlin evaluated Kingsbury with a GAF score of

45. Tr. 423.

Kingsbury consulted with Wonser in follow up on her anxiety symptoms on December 6

and 20, 2011. Tr. 433-434, 431-432.

On January 5, 2012, Kingsbury's Klamath & Lake Community Action Services "Benefits

Specialist" Walter B. Davis, acting in his capacity as Kingsbury's "Authorized Representative,"

wrote a letter to the Eugene Office of Disability Adjudication and Review. Tr. 216. By and

through his letter, Davis advised that although he had believed he had been helping Kingsbury to

prepare a DIB claim on the basis of her mental health symptoms he had recently learned for the

first time that she had already applied on the basis of physical symptoms alone, been denied, and

appealed the initial denial. Tr. 216. Davis further advised that he believed Kingsbury's

inconsistent statements, refusal to take medication, and fear of seeking help lest she be "locked

Page 17 - FINDINGS AND RECOMMENDATION

up" were "part of her illness." Tr. 216.

On January 19, 2012, Kingsbury was seen by Karen Nielsen, a therapist at the Klamath County Department of Mental Health. Tr. 425-428. Kingsbury reported symptoms of high anxiety and panic attacks, but denied any hallucinations since October 2010. Tr. 425-428. Kingsbury followed up with Wonser for anxiety again on January 23, 2012. Tr. 429-430. At the consultation of January 23, 2012, Kingsbury reported being in better control of her symptoms and feeling that she was on "a good path." Tr. 429.

On June 28, 2012, Kingsbury consulted with Kelly Patterson, M.D., complaining of neck pain, increased leg pain, and weakness in her right hand. Tr. 446-448. Patterson diagnosed possible fibromyalgia. Tr. 446-448. Although Kingsbury had complained to Patterson that the pain in her legs left her unable to walk, Patteron found no edema and no tenderness, no knee effusions or hypermobility or pain of the patella, a full range of patellar motion with no swelling, warmth, or pain, and that Kingsbury had normal strength, no atrophy, normal reflexes, normal muscle tone, and normal coordination and gait. Tr. 447.

On July 2, 2012, the Agency notified Kingsbury that a hearing had been set before an ALJ on August 15, 2012. Tr. 149-154, 155-167.

On August 15, 2012, a hearing was conducted before an ALJ in connection with Kingsbury's DIB application. Tr. 40-84. Appearing at the hearing were Kingsbury, her counsel, a vocational expert, and a medical expert (neurologist). Tr. 40-84. At the hearing, the medical expert testified that he did not believe Kingsbury's migraine headache symptoms, as reported in the medical records, met or equaled the relevant listing of 20 C.F.R. § 404, subpt. P, app. 1, that her symptoms met or equaled any other medical listing, or that the records supported any

neurological impairments or mental impairments. Tr. 44-49. Kingsbury testified in relevant part that in 2008 she tended to get migraine headaches every day, Tr. 52, that as of the date of the hearing she tended to get migraines twice weekly, Tr. 53-54, that she was incapacitated by her migraines, Tr. 54, that in connection with the last migraine she had experienced her legs became paralyzed for a matter of hours, Tr. 54, that she experienced panic attacks approximately once a week, Tr. 55-56, that she first used methamphetamine in 2005, Tr. 57-58, that she was unable to remember her childhood, Tr. 64, that the primary obstacle preventing her from being able to work was the pain in her back and legs, Tr. 65, that she could do some light housework, Tr. 68, that her right hand is so weak she cannot hold a cup to drink from because she fell and severed her wrist tendon while trying to save a baby, Tr. 69-70, and that she can only walk a block before needing to sit and rest, Tr. 70-72. The vocational expert testified to her opinion that a person with the RFC described by the ALJ would be able to work jobs existing in significant numbers in the national economy including housekeeper and garment sorter, but that if the person additionally required "special supportive supervision due to emotional lability and tendency to tearfulness" requiring unscheduled breaks and supportive assistance, or alternatively if the person would be absent from work twice monthly on an unscheduled basis due to migraine headaches, the person would be unable to work in those jobs competitively. Tr. 73-83.

On September 12, 2012, the ALJ denied Kingsbury's application for disability insurance benefits. Tr. 16-18, 19-33. Kingsbury timely requested review of the ALJ's decision on November 1, 2012, Tr. 8-15, 217-224, and the Appeals Council denied her request on December 3, 2013, Tr. 1-5. In consequence, the ALJ's decision of September 12, 2012, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see*

Page 19 - FINDINGS AND RECOMMENDATION

*also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Kingsbury did not engage in substantial gainful activity at any time following her claimed disability onset date of February 1, 2008. Tr. 21. She therefore proceeded appropriately to the second step of the analysis.

At the second step, the ALJ found that Kingsbury's medical impairments of "mild cervical degenerative disc disease; status post right wrist surgery; migraine headaches; anxiety disorder, not otherwise specified, with panic and reported agoraphobia; marijuana dependence; alcohol abuse; and history of methamphetamine abuse in reported remission" were "severe" for purposes of the Act. Tr. 21. The ALJ specifically found that, notwithstanding the medical expert's testimony at the hearing that Kingsbury's various diagnoses of mental impairments were not clearly established by the record, the record supported the conclusion that Kingsbury's anxiety disorder and substance abuse issues constituted severe impairments. Tr. 22. The ALJ further found that Kingsbury's diagnoses of probable or possible fibromyalgia were not sufficient to establish that condition as a medically determinable impairment, in that the diagnosing physicians did not report findings of any "tender points" on physical examination, whereas eleven such points are required for fibromyalgia to be medically determinable for purposes of the Act. Tr. 22; *see* S.S.R. No. 99-2p, No. 12-2p. Because the impairments caused by Kingsbury's degenerative disc disease, wrist pain and weakness, migraine headaches, anxiety disorder, and substance abuse issues were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Kingsbury's impairments was the equivalent

of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 22. Specifically,

the ALJ found that Kingsbury's degenerative disc disease did not meet listing 1.04 (disorders of

the spine) because the evidence of record did not establish the requisite nerve root compression,

spinal arachnoiditis, or lumbar spinal stenosis, that Kingsbury's wrist pain and weakness did not

meet listing 1.08 (soft tissue injury) because the injury to the wrist was not under the requisite

continuing surgical management and there was no finding in the record suggesting that major

function of the wrist was not expected to be restored within 12 months following surgery,[4] that

Kingsbury's anxiety symptoms did not meet listing 12.06 (anxiety related disorders, requiring

either satisfaction of the listing's "paragraph A" and "paragraph B" criteria or satisfaction of the

listing's "paragraph C" criteria) because the record did not establish, in connection with the

listing's paragraph B criteria, more than mild restriction in Kingsbury's activities of daily living,

more than moderate restriction in Kingsbury's social functioning, more than moderate difficulties

in concentration, persistence, or pace, or any episodes of decompensation of extended duration,

and because the record did not establish, in connection with the listing's paragraph C criteria, that

Kingsbury is completely unable to function independently outside the area of her home,[5] that

Kingsbury's issues with substance abuse did not meet listing 12.09 (substance addiction

disorders) because the record did not establish the requisite behavioral or physical changes,

---

[4] The ALJ did not expressly consider whether Kingsbury's wrist pain and weakness met listing 1.02 (major dysfunction of a joint).

[5] The ALJ did not expressly consider whether Kingsbury's mental impairments met listing 12.03 (schizophrenic, paranoid, and other psychotic disorders).

including in particular those associated with anxiety, which are evaluated under listing 12.06.[6]

Tr. 22-24.  The ALJ therefore properly conducted an assessment of Kingsbury's residual

functional capacity.

Regarding Kingsbury's physical RFC, the ALJ found that at all material times:

[Kingsbury had] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is unable to climb ladders, ropes, or scaffolds, and must avoid hazards and commercial driving.

Tr. 24.  Regarding Kingsbury's mental RFC, the ALJ found that at all material times:

[Kingsbury] is able to perform work not involving tasks requiring greater than Specific Vocational Preparation of 3, as defined by the Dictionary of Occupational Titles [(*i.e.*, work requiring up to three months of training)].  She can have no more than superficial contact with the general public and/or cooperative endeavors with coworkers.

Tr. 24.  In reaching these findings, the ALJ considered all of the material objective medical

evidence in the record bearing directly upon Kingsbury's asserted impairments, as well as

Kingsbury's own statements regarding her symptoms.  Tr. 24-31.

At the fourth step of the five-step process, the ALJ found that Kingsbury was unable to

perform her past relevant work.  Tr. 31-32.

At the fifth step, the ALJ found in light of Kingsbury's age, education, work experience,

and RFC that there were jobs existing in significant numbers in the national and local economy

that she could perform.  Tr. 32-33.  Specifically, the ALJ found that Kingsbury could perform the

requirements of representative light, unskilled occupations such as housekeeper, garment sorter,

and laundry sorter.  Tr. 33.  On that basis, the ALJ concluded that Kingsbury was not disabled as

defined in the Act at any time between February 1, 2008, and September 12, 2012.  Tr. 33.

---

[6] The ALJ further noted that there is no specific listing for migraine headaches.

## ANALYSIS

Kingsbury challenges the Commissioner's conclusion at the third step of the five-step process that her impairments did not meet or equal listings 1.04 (disorders of the spine) or 12.06 (anxiety related disorders) and the Commissioner's failure to conclude that her impairments met listings 1.02 (major dysfunction of a joint) or 12.03 (schizophrenic, paranoid and other psychotic disorders). In support of that challenge, Kingsbury assigns error in the adequacy of the ALJ's partial rejection and/or partial disregard of the medical opinions offered by Morrell and Grunwald. Although Kingsbury does not expressly challenge the Commissioner's assessment of her residual functional capacity, her argument can plausibly be construed as suggesting that the ALJ failed adequately to consider medical evidence of her migraine headaches in making that assessment, and that in consequence the Commissioner failed to meet her burden at the fifth step of the five-step process. I address each of Kingsbury's arguments, express and constructive, in turn.

I.    **Listings**

   A.    **The ALJ's Partial Rejection of Medical Evidence**

      1.    **Medical Opinion of Examining Psychologist Morrell**

As noted above, Morrell examined Kingsbury on January 31 and February 3, 2006, and prepared a comprehensive psychological evaluation reporting his findings. Tr. 225-236. Morrell opined that Kingsbury's "self-report was riddled with inconsistencies" and characterized numerous of her self-reported claims regarding her life experience as "nothing short of fantastic." Tr. 230. Morrell opined that Kingsbury was a "highly unreliable individual who misrepresented a host of legal events, always criticizing the system, accusing it of having been in error,

exonerating herself, and casting blame on other individuals." Tr. 234. "[I]n each case," Morrell

opined, "[Kingsbury] was [self-reportedly] falsely accused yet always convicted." Tr. 234.

Regarding her unreliable self-reporting, Morrell stated:

> Were it not for [Kingsbury]'s presentation as an individual who could "kid
> herself" with fantastic tales, true features of psychosis would have clearly been
> concluded. (Drug use also may have been operating at such points). Thus,
> [Kingsbury] presented an unreliable self-report, with disjointed and possibly
> psychotic thinking processes. Were it not also for her generally intact
> associations, psychosis would have been the "default." Nonetheless, a true
> psychosis was not ruled out.

Tr. 230. Specifically regarding psychosis, Morrell similarly opined that:

> Certain of [Kingsbury's] descriptions suggested the possibility of psychosis,
> although her associations were typically intact, and she simply did not present as
> an individual actively delusional. [Morrell was] more inclined to see [Kingsbury]
> as someone who is low-functioning in the verbal arena and more inclined toward
> characterologically pathologic lying in which she creates fantasies that are simply
> 'ridiculous' and has done so for an extended period of time. [Kingsbury's]
> misrepresentation collectively distills down to character-disordered features in an
> individual who seems to be a creature of habit, prone toward misrepresentation
> and shady dealings without accountability. When "caught," she cries innocence
> and claims the system misunderstood her or she was the victim of circumstances.

Tr. 235.

Morrell ruled out generalized anxiety disorder, obsessive-compulsive disorder, panic

disorder, and social phobia as diagnoses for Kingsbury. Tr. 227. Morrell opined that it was

possible, but unlikely, that Kingsbury suffered from post-traumatic stress disorder ("PTSD"). Tr.

227. Morrell found that Kingsbury's attentional properties "were generally intact," Tr. 230-231,

and that she manifested a borderline verbal intellect and a marginally average performance/

nonverbal intellect on the WAIS-III intelligence test, Tr. 231. Morrell found no "evidence of

attentional disturbance on the Conners Performance Test." Tr. 232. Morrell opined that

Kingsbury's MMPI-2 personality inventory and other psychometric tests were of "compromised

Page 24 - FINDINGS AND RECOMMENDATION

psychometric reliability and validity based on significant defensiveness," Tr. 232, but that such

tests nevertheless indicated an absence of depression or anxiety, and generally produced results

consistent with "character disordered features, self-indulgence, hyperactivity and impulsivity,

risk-taking behavior, failure to learn from consequences, and a history of antiauthoritarian

involvement and illegal activity," Tr. 232. Individuals meeting that profile, Morrell opined:

> tend to be overactive, impulsive, irresponsible, untrustworthy, and shallow in their
> interpersonal relationships. They characteristically have easy morals, fluctuating
> ethical values, and readily circumvented consciences. A high percentage of these
> individuals engage in extramarital relationships and have very poor marital
> adjustment. They are typically quite egocentric and, while forming a favorable
> impression, are often derelict in their responsibilities toward others. . . . Their
> poor self-control often contributes to drinking and/or drug difficulties. . . . Such
> individuals tend to have an especially well socialized veneer and are often glib.
> Prognosis for change is very poor, with many terminating treatment against
> professional advice.

Tr. 232-233. Kingsbury's "[s]ubscale analysis was most striking for the absence of depression or

anxiety. Little indication of distress is noted." Tr. 232.

Morrell diagnosed Kingsbury on Axis I with methamphetamine, cocaine, and opioid

dependence in sustained remission per self-report, with methamphetamine-induced psychosis,

largely resolved, with a history of anxiety disorder NOS, largely resolved, and with a history of

probable neglect of children, and made "rule out" diagnoses indicating a "mild suspicion" of

psychotic disorder NOS and possible reading disorder, possible disorder of written expression,

possible victim of domestic abuse, and possible perpetrator of domestic abuse. Tr. 233-234. On

Axis II, Morrell diagnosed Kingsbury with borderline verbal intellect, marginally average

performance/nonverbal intellect, and personality disorder NOS with features of histrionic/

narcissistic/antisocial personality, and made a "rule out" diagnosis of antisocial personality

disorder. Tr. 234. Morrell deferred diagnosis on Axis III, noted "unclear psychological stressors

Page 25 - FINDINGS AND RECOMMENDATION

on Axis IV, and on Axis V assigned Kingsbury a GAF score of 50. Tr. 234. Morrell ultimately

urged "caution" in connection with DHS' inquiry and did not recommend that Kingsbury be

reunited with her children "just yet." Tr. 235.

The ALJ briefly discussed Morrell's opinion, chiefly his assessment of Kingsbury's GAF

score of 50. Tr. 31. In addition, the ALJ noted that Morrell's evaluation was provided more than

two years prior to Kingsbury's alleged disability onset date of February 1, 2008, and that Morrell

expressed serious concerns regarding Kingsbury's credibility. Tr. 31. "Due to these credibility

concerns, and the fact that Dr. Morrell necessarily had to base his assessment in some part on

[Kingsbury]'s subjective reports," the ALJ assigned Morrell's assessment of Kingsbury's GAF

score "only some weight." Tr. 31. Kingsbury appears to take the position that the ALJ erred in

failing to discuss and credit Morrell's "rule out" diagnosis indicating a "mild suspicion" of

psychotic disorder NOS and his discussion of the possibility – which Morrell himself expressly

discounted – that Kingsbury's tendency to offer unreliable self-reports of her own history could

be related to psychotic thinking processes.

To reject the uncontroverted opinion of a treating or examining physician, an ALJ must

articulate "clear and convincing" reasons for so doing. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216

(9th Cir. 2005), *citing Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995). If a treating or

examining physician's opinion is in conflict with substantial medical evidence or with another

physician's opinion, however, it may be rejected for merely "specific and legitimate reasons." *Id.*

Here, as a preliminary matter, Morrell's assessment of Kingsbury's GAF score is controverted by

the GAF evaluation of November 8, 2010, Tr. 337, among other such evaluations, and the ALJ's

reasons for discounting Morrell's assessment were specific and legitimate. No error inheres in

the ALJ's treatment of Morrell's assessment of Kingsbury's GAF score.

More germanely to Kingsbury's theory of her case, the ALJ's failure to address Morrell's discussion of the possibility that some of Kingsbury's behavior might be attributable to a diagnosis of psychosis was not erroneous, in that Morrell did not opine that Kingsbury suffered from psychosis, but rather opined that it was unlikely that she did so, and listed only a "rule out" diagnosis reflecting his "mild suspicion" that psychosis could be present, without suggesting the existence of any limitations or impairments that might flow from such a diagnosis if it were established. The ALJ is not required to address every piece of medical evidence in the record, but rather only evidence bearing upon a claimant's severe impairments. *See, e.g., Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003); *Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984). Moreover, even if the failure to address Morrell's discussion of the possibility that Kingsbury could be diagnosed with psychosis were considered erroneous, such error would necessarily be harmless, in that even if Morrell's unaddressed opinion were credited as true, the unaddressed opinion would neither negate the validity of the ALJ's ultimate conclusion nor call into question the substantial evidence underlying the ALJ's decision. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion'"), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("[a] decision of the ALJ will not be reversed for errors that are harmless"). Kingsbury's assignment of error in the ALJ's treatment of Morrell's medical opinion therefore provides no grounds for disturbing the Commissioner's final decision.

### 2.   Medical Opinion of Examining Physician Grunwald

As noted above, on August 18, 2010, Oregon Disability Determination Services physician Grunwald prepared a comprehensive neurologic evaluation of Kingsbury on the basis of tests, interviews, and review of medical records (not including Morrell's comprehensive psychological evaluation of 2006). Tr. 299-307. Kingsbury reported to Grunwald that she first developed migraine headaches approximately twenty years previously, and that she experienced migraines approximately once per week with symptoms of nausea and dizziness. Tr. 299-300. Kingsbury further reported to Grunwald that she had fainted twice on hot days over the past two years and had been diagnosed with heat stroke, but that she had no disabilities associated with that condition. Tr. 300. Kingsbury further reported that she had experienced elbow pain for approximately one year but that it was now resolved. Tr. 300. Kingsbury reported a hand tremor and that she had undergone surgery five days previously in connection with a torn tendon. Tr. 300. Kingsbury further reported that she had never noticed that she had suffered any lapse of memory, but that her children and her drycleaner had advised her that she had suffered memory loss; notwithstanding her report to Grunwald, she also recited to Grunwald numerous anecdotes involving her own memory loss, confusion, or both. Tr. 300. Kingsbury further reported that she had been experiencing lower back pain for the past two weeks. Tr. 302.

Regarding Kingsbury's migraines, Grunwald opined that her headaches were being sub-optimally treated without appropriate evidence-based therapy. Tr. 304. Grunwald noted, however, that Kingsbury reported that coffee helped "resolve" her headaches, as did medical marijuana which she relied upon at a rate of three ounces per month. Tr. 299, 300. Grunwald opined that Kingsbury's fainting episodes were likely associated with heat stroke and were

treatable and non-disabling.  Tr. 304.

Regarding Kingsbury's elbow, hand, and joint pain, Grunwald found no disabling injury in Kingsbury's elbows.  Tr. 304.  Regarding Kingsbury's reflexes in her extremities, Grunwald found no clonus and no Babinski reflex, and evaluated her reflexes as +2/4 for her bilateral biceps and triceps, +2/4 for her right patellar and +1/4 for her left patellar, and +1/4 for her bilateral Achilles tendon.  Tr. 302.  Grunwald found that Kingsbury's motor strength in her upper and lower extremities was normal other than in her right forearm, and opined that the weakness of her right forearm was due to her recent surgery and "would likely be 5/5 in a normal situation."  Tr. 302-303.  Similarly, Grunwald found that Kingsbury's grip strength was reduced in her right hand, Tr. 303, but that her hand strength could be expected to return to normal following recovery from surgery, Tr. 302-303, and that no trembling was observable in Kingsbury's hands, Tr. 304.

Regarding memory loss, Grunwald found that Kingsbury scored a 35/35 on the mini mental state examination.  Tr. 301.  Grunwald found no evidence that Kingsbury suffered any impairment of memory.  Tr. 304.

Regarding low back pain, Grunwald found tenderness to palpation in the paraspinal muscles at the T5 level, and Kingsbury reported that she experienced pain in all of her joints and muscles on both lower extremities, anteriorly, posteriorly, and laterally.  Tr. 303.  Grunwald asserted that Kingsbury's low back pain was "beyond the scope" of his examination, but nevertheless opined that the symptoms were "possibly associated with degenerative changes and muscle strain."  Tr. 304.

Overall, Grunwald found no problems with Kingsbury's gait, stance, or manipulative

ability other than that caused by recent surgery, no muscle weakness, no problems with sensitivity, no postural problems, no problems with balance or coordinated movement, and no fatigue problems. Tr. 304-307. Grunwald also found no mental or cognitive deficits or limitations. Tr. 304-307. Grunwald opined that Kingsbury could stand for 30 minutes at a time with periodic breaks, could walk at least half a mile, and could sit for fifteen minutes at a time with periodic breaks. Tr. 306.

The ALJ discussed Grunwald's medical opinion in detail. Tr. 26-27, 29-30. The ALJ largely credited Grunwald's opinion fully, but rejected Grunwald's findings that Kingsbury could stand for not more than 30 minutes at a time or sit for not more than fifteen minutes at a time. As to those findings, the ALJ found that they were not supported by evidence elsewhere in the record and were, in addition, inconsistent with Kingsbury's presentation at the hearing. Tr. 30. In addition, the ALJ did not address Grunwald's brief discussion of the possible etiology of Kingsbury's reported symptoms of low back pain. Kingsbury appears to take the position that the ALJ erred in failing to credit Grunwald's opinion regarding Kingsbury's migraine headaches and back and joint pain. As noted above, to reject the uncontroverted opinion of a treating or examining physician, an ALJ must articulate "clear and convincing" reasons for so doing, and to reject the controverted opinion of a treating or examining physician must articulate "specific and legitimate reasons" for so doing. *Bayliss*, 427 F.3d at 1216.

Here, it is clear that the ALJ did not reject Grunwald's opinion regarding Kingsbury's reported migraine headache symptoms but rather credited them, including Grunwald's observation that Kingsbury reported success in "resolving" them with caffeine and/or marijuana, and his opinion that Kingsbury's fainting symptoms were not attributable to her migraine

headaches. Tr. 26. The ALJ therefore did not err by improperly rejecting Grunwald's opinion regarding Kingsbury's migraine headaches.

As to the ALJ's failure to address Grunwald's brief discussion of the possible etiology of Kingsbury's reported symptoms of low back pain, that failure was not erroneous in that Grunwald expressly asserted that Kingsbury's back pain symptoms were outside the scope of his evaluation. Tr. 304. Moreover, even if that failure were considered erroneous, such error would necessarily be harmless, in that even if the unaddressed opinion as to the possible etiology of Kingsbury's back pain were credited as true, the unaddressed opinion would neither negate the validity of the ALJ's ultimate conclusion nor call into question the substantial evidence underlying the ALJ's decision, *see Molina*, 674 F.3d at 1115, *Burch*, 400 F.3d at 679, in that Grunwald did not opine as to limitations or impairments flowing from Kingsbury's back pain.

As to the ALJ's purported rejection of Grunwald's opinion regarding Kingsbury's joint and back pain symptoms, in fact the ALJ addressed and credited that portion of Grunwald's opinion. Tr. 26-27, 29-30. No error inheres in the ALJ's treatment of Grunwald's opinion regarding Kingsbury's joint and back pain.

Finally, although Kingsbury does not raise the issue, I note that the ALJ adduced adequate reasons for his express partial rejection of Grunwald's opinion regarding limitations on Kingsbury's ability to stand or to sit for extended periods of time. That opinion is controverted by other evidence of record, including the medical opinion of Patterson regarding Kingsbury's normal gait, coordination, strength, reflexes, and muscle tone, Tr. 447, and the hearing testimony of the medical expert that Kingsbury's X-Ray studies did not reveal any condition relevant to her claimed pain symptoms, Tr. 47. As such, the ALJ was required only to provide specific and

Page 31 - FINDINGS AND RECOMMENDATION

legitimate reasons for rejecting the opinion, which he did.

For the foregoing reasons, Kingsbury's assignment of error in the ALJ's treatment of Grunwald's medical opinion provides no grounds for disturbing the Commissioner's final decision.

### B.    The ALJ's Findings at the Third Step of the Sequential Process

As noted above, at step three the ALJ expressly found (*inter alia*) that Kingsbury's degenerative disc disease did not meet listing 1.04 (disorders of the spine) because the evidence of record did not establish the requisite nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, and that Kingsbury's anxiety symptoms did not meet listing 12.06 (anxiety related disorders, requiring either satisfaction of the listing's "paragraph A" and "paragraph B" criteria or satisfaction of the listing's "paragraph C" criteria) because the record did not establish, in connection with the listing's paragraph B criteria, more than mild restriction in Kingsbury's activities of daily living, more than moderate restriction in Kingsbury's social functioning, more than moderate difficulties in concentration, persistence, or pace, or any episodes of decompensation of extended duration, and because the record did not establish, in connection with the listing's paragraph C criteria, that Kingsbury is completely unable to function independently outside the area of her home, and did not address whether Kingsbury's wrist pain and weakness met listing 1.02 (major dysfunction of a joint) or whether Kingsbury's mental impairments met listing 12.03 (schizophrenic, paranoid, and other psychotic disorders).  Tr. 22-24.  Kingsbury challenges the ALJ's failure to find that her conditions met each of listings 1.02, 1.04, 12.03, and 12.06.

Listing 1.04 governs disorders of the spine:

*Disorders of the spine (e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B.   Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, subpt P, app. 1, listing 1.04.  Because no evidence of record, even if credited as true, suggests satisfaction of any of the three sets of factors requisite to meeting listing 1.04, the ALJ's finding that listing 1.04 was not met was free of error.  Kingsbury's assignment of error in the ALJ's treatment of listing 1.04 therefore provides no grounds for disturbing the Commissioner's final decision.

Listing 1.02 governs major joint dysfunction:

*Major dysfunction of a joint(s) (due to any cause)*:  Characterized by gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

> A.    Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

> B.    Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § 404, subpt P, app. 1, listing 1.02.  Listing 1.00B(2)(c) provides as follows:

> *What we mean by inability to perform fine and gross movements effectively.*
> Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.  Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. § 404, subpt P, app. 1, listing 1.00(B)(2)(c).  Although the ALJ did not expressly

address listing 1.02, her failure to do so was not erroneous, in that there is no medical evidence

of record which, if credited as true, would suggest Kingsbury's inability to perform fine or gross

movements effectively with her right hand/wrist as discussed in listing 1.00B(2)(c), let alone that

such inability could be expected to persist for a period of not fewer than twelve months.

Kingsbury's assignment of error in the ALJ's failure to address listing 1.02 therefore provides no

grounds for disturbing the Commissioner's final decision.

Listing 12.06 governs anxiety-related disorders:

Page 34 - FINDINGS AND RECOMMENDATION

*Anxiety Related Disorders:*  In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.    Medically documented findings of at least one of the following:

    1.    Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a.    Motor tension; or

        b.    Autonomic hyperactivity; or

        c.    Apprehensive expectation; or

        d.    Vigilance and scanning;

or

    2.    A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3.    Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4.    Recurrent obsessions or compulsions which are a source of marked distress; or

    5.    Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.    Resulting in at least two of the following:

    1.    Marked restriction of activities of daily living; or

2.      Marked difficulties in maintaining social functioning; or

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration.

OR

C.      Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. § 404, subpt P, app. 1, listing 12.06. The ALJ did not address paragraph A, but rather found that Kingsbury's medically determinable impairments did not meet or equal the requirements of either paragraph B or paragraph C. The ALJ correctly noted that to meet the requirements of paragraph B, at least two of the listed criteria had to be present. As to the paragraph B criteria, the ALJ found, in light of the evidence of record, that Kingsbury suffered from no more than "mild" restriction in her activities of daily living, in that there are no medical reports indicating any greater restrictions and in that Kingsbury's activities of daily living included the ability to keep and attend therapy appointments, shopping with a friend, and participation in hobbies such as beading and reading. Tr. 23. The ALJ further found that Kingsbury had no more than "moderate" difficulties in maintaining social functioning, in that on April 27, 2011, an Agency consultant determined that Kingsbury's difficulties with social interactions were moderate, her self-reported daily activities included attending biker church and maintaining friendships and family connections, and she performed well in group therapy sessions and presented with appropriate affect. Tr. 23. The ALJ further found that Kingsbury had no more than "moderate" difficulties in maintaining concentration, persistence, or pace, citing to evidence of record tending to establish that Kingsbury had average intellectual function

Page 36 - FINDINGS AND RECOMMENDATION

with intact memory and judgment, as well as Kingsbury's self-reported daily activities of reading and involvement in hobbies and reports of her performance in group therapy. Tr. 23. Finally, the ALJ further found that there was no medical evidence that Kingsbury had ever experienced an episode of decompensation of extended duration, correctly noting that Kingsbury's hospitalizations of November 2010 and May 2011 each lasted less than one week, and were therefore not of "extended" duration. Tr. 23-24. The ALJ thus concluded that none of the criteria of paragraph B, let alone the requisite two, were satisfied. Tr. 24. The ALJ's reasons for so concluding are convincing and supported by substantial evidence of record. As such, there is no error inhering in the ALJ's findings regarding listing 12.06(B).

As to the paragraph C criterion, the ALJ correctly found that no evidence of record suggests Kingsbury's complete inability to function outside the area of her home. Tr. 24. No error inheres in the ALJ's finding regarding listing 12.06(C). It follows from the foregoing that the ALJ did not err in finding that Kingsbury's impairments did not meet or equal listing 12.06.

Listing 12.03 governs psychotic disorders:

*Schizophrenic, Paranoid and Other Psychotic Disorders*: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

    A.    Medically documented persistence, either continuous or intermittent, of one or more of the following:

        1.    Delusions or hallucinations; or

        2.    Catatonic or other grossly disorganized behavior; or

        3.    Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

a. Blunt affect; or

b. Flat affect; or

c. Inappropriate affect;

or

4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, subpt P, app. 1, listing 12.03. Although the ALJ did not expressly address

listing 12.03, I note that listing 12.03(B), is identical in all respects to listing 12.06(B), and find

on that basis that the ALJ's failure to address listing 12.03(A) and (B) could not have been

harmful error, in that the same grounds adduced by the ALJ in support of his conclusions

regarding listing 12.06(B), are applicable with equal force to listing 12.03(B). Moreover, the

ALJ's discussion of listing 12.06(B)(4) applies with equal force to listing 12.03(C)(1), and no

evidence of record suggests that the criteria of listing 12.03(C)(2) or (3) could be satisfied. The

ALJ's failure to address listing 12.03 was therefore not erroneous.

     For the foregoing reasons, Kingsbury's assignments of error in the ALJ's performance of

the third step of the sequential process provides no grounds for disturbing the Commissioner's

final decision.

## II.  Kingsbury's RFC

     As noted above, although Kingsbury makes no express assignment of error in the ALJ's

assessment of her RFC, her argument could reasonably be construed as suggesting that the ALJ

failed adequately to consider medical evidence of her migraine headaches in making that

assessment, and in consequence failed to meet her burden at the fifth step of the five-step

process. In fact, the ALJ expressly addressed the evidence of Kingsbury's migraine headaches,

including both Kingsbury's own testimony as to their severity and accompanying symptoms and

the medical evidence of their frequency and severity. Tr. 25, 26.

     At the hearing, Kingsbury testified in relevant part that in 2008 she tended to get migraine

headaches every day, Tr. 52, that as of the date of the hearing she tended to get migraines twice

weekly, Tr. 53-54, that she was incapacitated by her migraines, Tr. 54, and that in connection

with the last migraine she had experienced her legs became paralyzed for a matter of hours, Tr.

54.  The ALJ expressly found that Kingsbury's testimony regarding the severity of her migraines

was not credible.  Tr. 25.  When a claimant's medical record establishes the presence of a

"medically determinable impairment" that "could reasonably be expected to produce the

[claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in

describing the extent of those symptoms.  20 C.F.R. § 404.1529.  In the event the ALJ determines

that the claimant's report is not credible, such determination must be made "with findings

sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v.*

*Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).  In weighing a claimant's credibility,

the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies

either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily

activities, h[is] work record, and testimony from physicians and third parties concerning the

nature, severity, and effect of the symptoms of which claimant complains."  *Id.* (internal

modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  While a finding

that a claimant lacks credibility cannot be premised solely on a lack of medical support for the

severity of his pain, *see Light*, 119 F.3d at 792, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

1995), where the ALJ's credibility finding is supported by substantial evidence in the record, the

finding will not be disturbed, *Thomas*, 278 F.3d at 959, *citing Morgan v. Commissioner of the*

*SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

     Here, the ALJ found that the degree of severity to which Kingsbury testified was

inconsistent with the record as a whole, in that Kingsbury did not make consistent reports of her

migraine symptoms to her various treatment providers, sometimes reporting "no headaches," Tr. 274, 276. Tr. 25. In addition, the ALJ found that Kingsbury's self-reports of her physical symptoms were in general not credible, in that she routinely reported symptoms far more debilitating and intense than could be supported by the objective medical findings. Tr. 25. The ALJ additionally noted that, despite Kingsbury's testimony that her migraine symptoms were incapacitating, Kingsbury reported to health-care providers that caffeine and marijuana were effective to "resolve" them, Tr. 299, 300. Tr. 26. Because the ALJ's reasons for discrediting Kingsbury's self report were sufficiently specific to establish that the ALJ did not reject Kingsbury's testimony arbitrarily, there is no error in the ALJ's determination of Kingsbury's credibility.

As to Grunwald's medical opinion regarding Kingsbury's migraine symptoms, as discussed above the ALJ did not reject Grunwald's opinion regarding Kingsbury's reported migraine headache symptoms but rather credited them, including Grunwald's observation that Kingsbury reported success in "resolving" them with caffeine and/or marijuana, and his opinion that Kingsbury's fainting symptoms were not attributable to her migraine headaches. Tr. 26. The ALJ therefore did not err by improperly rejecting Grunwald's opinion regarding Kingsbury's migraine headaches.

For the foregoing reasons, Kingsbury's constructive assignments of error in the ALJ's assessment of her RFC provide no grounds for disturbing the Commissioner's final decision.

## III.    Existence of Jobs the Claimant Could Perform in the National Economy

Because for reasons discussed above I find that the ALJ did not err in her assessment of Kingsbury's RFC, and because there is no actual or constructive assignment of error in the ALJ's

finding that a person with Kingsbury's RFC as assessed by the ALJ could perform jobs existing in significant numbers in the national economy, it follows that Commissioner met her burden at the fifth step of the five-step sequential process.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Kingsbury's application for disability insurance benefits should be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 9th day of September, 2015.

Honorable Paul Papak
United States Magistrate Judge

Page 42 - FINDINGS AND RECOMMENDATION